UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SUELLEN SEIDNER TRITT,                  :
                                        :
        Plaintiff,                      :
                                        :
V.                                      :  CASE NO. 3:06-CV-2065 (RNC)
                                        :
AUTOMATIC DATA PROCESSING,              :
INC. LONG TERM DISABILITY PLAN,         :
and AUTOMATIC DATA PROCESSING,          :
INC. LONG TERM DISABILITY PLAN          :
ADMINISTRATOR,                          :
                                        :
        Defendants.                     :

RULING AND ORDER

Plaintiff brings this action under the Employee Retirement
Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) &
(a)(3), claiming she was wrongfully denied benefits under her
former employer's long term disability plan ("the Plan"), because
she was totally physically disabled on September 13, 1993, when
her benefits under the Plan were terminated.[1]  She alleges that
she suffered from chronic fatigue syndrome ("CFS") at that time.
Defendants argue that plaintiff's disability on that date was
psychological, not physical, so her payments were properly
terminated under the Plan's 24-month limitation on benefits for
psychological or emotional disabilities.  They allege that she
suffered from depression, anxiety and post-traumatic stress
disorder.  The parties have filed cross-motions for judgment on

---

[1] In her complaint, plaintiff also claimed a violation of 29
U.S.C. § 1132(c).  Judge Droney, who presided over this case
until December 2011, granted the defendants' motion for summary
judgment on this count.  See Doc. 44.

the administrative record (docs. 159 & 160).  While I agree with plaintiff that during the relevant time period she had a co-morbid condition – a co-occurrence of physical and mental illness – she has not shown by a preponderance of the evidence that the physical disorder was itself totally disabling.  In other words, she has failed to prove that her disability was not caused by a mental illness.  I therefore grant defendants' motion and deny plaintiff's.  Plaintiff has also moved for sanctions under Fed. R. Civ. P. 11 (doc. 169).  That motion is denied as well.

I.   Facts

    The following facts are established by the record.

    Plaintiff's Employment with ADP

    Plaintiff Suellen Seidner Tritt was employed as a Senior Knowledge Engineer with Automatic Data Processing ("ADP") from January 1990 through June 14, 1991.  Plaintiff reports that in early 1991, she had contact with a co-worker who was severely fatigued, and soon thereafter she developed a stiff neck, exhaustion, sore throat, and insomnia.[2]  In April 1991, plaintiff was sexually harassed by a coworker.  After she reported the incident, the coworker was fired.  Plaintiff was on vacation in June of that year when she was informed that funding for her project at ADP had been cut.  She did not return from vacation,

---

    [2] Defendants deny that she in fact experienced these symptoms at that time, and these allegations are not supported by medical evidence in the appeal record.

2

instead leaving her job on June 14 with a diagnosis of dysthymia[3] and symptoms of depression, anxiety, insomnia, fearfulness and loss of self-confidence related to the incident of harassment. At that time, plaintiff's marriage was disintegrating, and she was romantically involved with Ralph Tritt, whom she later married.

On September 16, 1991, plaintiff submitted a claim for long term disability benefits under ADP's Long Term Disability Plan based on her dysthymic disorder, a psychiatric condition. Her claim was initially rejected, but she was later deemed eligible for 24 months of disability benefits, effective September 13, 1991. In appeals of her claim determination, plaintiff has argued that she was totally disabled with chronic fatigue syndrome, a physical condition, before September 13, 1993, and she should therefore continue to receive benefits.

The Plan

ADP's 1986 Long Term Disability Plan[4] is an employee welfare benefit plan governed by ERISA. The Plan covers permanent full-time ADP employees who work in the United States and are not covered by a collective bargaining agreement. Appeal Record

---

[3] Dysthymia is a "mild, but chronic, form of depression." Mayo Clinic, Dysthymia Definition, http://www.mayoclinic.com/health/dysthymia/DS01111.

[4] The Plan was amended in 1994; however Judge Droney ruled that this action is governed by the 1986 Plan. See Doc. 65.

3

("AR") 47.  The Plan provides long term benefits to covered

persons who have a "total disability," defined as:

> the Person's complete inability, due to accidental bodily
> injury or sickness or both,
> (a) during the waiting period and the first twenty-four
> months of such disability, to perform any and every duty
> pertaining to his own occupation; and
> (b) during any continuance of such disability following the
> first twenty-four months of disability, to engage in any
> work or occupation for which he is reasonably fitted by
> education, training or experience.

AR 54.  It is the claimant's responsibility to notify ADP of a

claim and to furnish the DP with written proof of her total

disability.  Id.  Upon receipt of any notice or proof, ADP may

have a physician examine the claimant.  Id.  The Plan provides a

monthly payment of up to two-thirds of the beneficiary's salary,

capped at $200,000 annually.  AR 56.

Typically, if a beneficiary becomes disabled before age 60,

benefits terminate the day before she turns 65.  AR 58.  However,

"[b]enefits will be payable for disability caused by or resulting

from neurosis, psychoneurosis, psychotherapy, psychosis or any

other mental or emotional illness or functional disorder for up

to a maximum of 24 months."[5]  AR 58.  In other words, if an

employee is totally physically disabled, she may collect benefits

until age 65, but if she is totally psychologically disabled, she

may collect benefits for two years only.

---

[5] The Plan makes an exception for persons confined in a
mental health institution or undergoing regular shock therapy.
Neither exception applies in this case.

The parties agree that under the Plan, if plaintiff was totally disabled by chronic fatigue syndrome by September 13, 1993 – 24 months after she became eligible for benefits – then her benefits should not have terminated on that date.

<u>Claim History and Medical Evaluations</u>

Plaintiff challenges a January 23, 2006 decision by the Plan administrator affirming her denial of benefits after September 12, 1993.  That decision was based on an approximately 2,000 page administrative record.  The information set forth below is based on review of the record now before the Court.

***Claim Submission and D'Anton IME***

Plaintiff submitted her claim to Prudential, then the plan administrator, in September 1991, stating she was disabled by a dysthymic disorder.  AR 422.  Dr. Jack Tedrow, who examined plaintiff while she was in Salt Lake City that year, noted subjective symptoms of depression, anxiety, insomnia, fearfulness and loss of self-confidence.  Dr. Tedrow found plaintiff to be totally disabled.  AR 424-25.

Pursuant to the Plan, Prudential referred her to psychologist Michael D'Anton, Ph.D., for an independent medical examination ("IME").  AR 388 *et seq*.  Dr. D'Anton met with plaintiff and concluded that she was not disabled but was instead malingering, or feigning symptoms.  He stated in his report:

  Upon examination, the subject presents as histrionic,
  melodramatic, and oriented in all spheres.  Questions were

responded to with convoluted and manipulative stories.  Her
focus was to present as a victim.  Any flaws in her
presentation were met with evasion and manipulative actions.

AR 393.  He opined that plaintiff was producing symptoms to

"extract compensation from ADP for disappointing her by

terminating her project."  AR 397.  Dr. D'Anton did not

administer any objective tests for malingering.  Based on

plaintiff's medical records and the D'Anton IME, Prudential

denied plaintiff's claim for benefits.

### *Neffinger Letter and First Award*

Plaintiff objected to the decision, but when she failed to

provide Prudential with a requested narrative from her treating

physician, Prudential affirmed its denial in April 1992.  That

month, Dr. G.G. Neffinger, director of the Rockland County

Department of Mental Health's Acute Day Treatment Program,

informed Prudential that plaintiff had been admitted to the

program "for treatment of major depressive symptoms and an

inability to function in reaction to the break-up of her marriage

and loss of her job."  Dr. Neffinger stated that plaintiff had

been discharged on April 18, and was capable of seeking full-time

employment.  AR 337-38, 347-48.  Prudential then granted

plaintiff disability benefits through April 18, 1992 only.

### *Pomona Clinic: Observation and Self-Diagnosis*

Plaintiff attended a weekly Women's Psychoeducational

Therapy Group at the Department of Mental Health's Pomona Clinic

beginning in April 1992.  Group leader Hilary Ryglewicz, C.S.W.,
made regular observations of plaintiff's behavior during group
meetings, noting symptoms of depression and post-traumatic stress
disorder.  <u>See, e.g.</u>, AR 572 (August 2, 1993).

In April 1993, Ryglewicz noted that plaintiff was "convinced
she suffers from 'Chronic Fatigue Immune Dysfunction Syndrome,'
which she read about on her own and 'no M.D. knows about.'"  AR
883.

### Rothman Report

On May 8, 1992, on the referral of plaintiff's physician,
Dr. Arthur Rothman performed a neurological examination and found
plaintiff to be physically normal, with no head or spinal
tenderness.  Regarding plaintiff's mental status, Rothman wrote,
"[c]alculations and general fund of knowledge were good."  AR
452-53.  He found that plaintiff suffered from migraine
headaches, and he prescribed medication for headache relief.

### Lawrence Report

Plaintiff's physician at the Rockland County Department of
Mental Health, psychiatrist Dr. Scott Lawrence, sent a report to
the New York State Department of Social Services Office of
Disability Determinations on June 25, 1993.[6]  He noted that he

---

[6] While Dr. Lawrence's report does not state that he
personally examined plaintiff, the Social Security
Administration's disability determination rationale refers to Dr.
Lawrence as plaintiff's "treating physician."  AR 1404.

had been treating plaintiff since December 5, 1991.  In the space
for "Treating Diagnoses," Dr. Lawrence wrote:

> 296.23  Major depression, chronic
> prev. 300.40  Dysthymia
> 309.89  Post-Traumatic Stress Disorder
> Axis III : ?  Chronic Fatigue Syndrome

AR 672.  He noted that plaintiff's symptoms were: "Depression,
anxiety attacks, nightmares, insomnia, exhaustion/fatigue, memory
problems, pain & weakness experienced in hands, arms, feet, legs,
migraine headaches (occas.), poor concentration."  Id.  He
concluded that plaintiff "does not appear able to achieve stable
work functioning at this time because of skill impairments, mood
disorder, anxiety and loss of self-confidence & stress reactivity
. . . ."  AR 675.  At the end of his report, Dr. Lawrence stated
that "[p]ossible implications of CFIDS (chronic fatigue syndrome)
currently being explored."  AR 678.  It appears that based on
this report, the Social Security Administration found plaintiff
disabled, citing all four disorders listed under "treating
diagnoses."  AR 1404-05.[7]

   ***1994 Claim Review and Award***

_____

   [7] While this disability determination rationale is from
1998, it refers to "findings at the CPD."  The CPD, or comparison
point decision, is the most recent decision finding a claimant
disabled.  See Social Security Online, POMS Section: DI
81010.215, https://secure.ssa.gov/poms.nsf/lnx/0481010215 (last
visited Apr. 11, 2012).  The findings at the CPD trace the words
of Dr. Lawrence's 1993 report, indicating that his report formed
the basis of those findings.

On May 4, 1993, Ralph Tritt, plaintiff's husband, objected to the April 1992 termination of plaintiff's benefits.  At Prudential's request, he provided a power of Attorney in February 1994.

On May 3, 1994, Ryglewicz sent Prudential a letter stating that plaintiff had received continuous treatment at the Pomona Clinic.  She said plaintiff "presented with depression, anxiety, panic attacks and other symptoms of post-traumatic stress disorder," and plaintiff's current diagnosis was "Major Depression and Post-Traumatic Stress Disorder, with additional symptoms attributable to Chronic Fatigue Syndrome (per DSM-IV)." AR 316.  Ryglewicz noted that plaintiff appeared "currently unable to function in a work setting because of her extreme fatigue, low energy level, multiple functional problems and pains. . . . Her depression and anxiety symptoms have been only partially relieved by medication." Id.

Prudential sent plaintiff an "award/denial letter" on June 28, 1994, granting plaintiff benefits through September 12, 1993 based on a psychiatric condition causing a total disability, but denying plaintiff continuing benefits based on a physical disability.  Prudential found that plaintiff's medical records did not support a physical condition causing a total disability.

### Levine Report I

Plaintiff began seeing Dr. Susan Levine for treatment of

9

chronic fatigue syndrome in 1994.  According to Dr. Levine, CFS
is "a chronic, debilitating disorder characterized by severe
exhaustion; muscle and joint aches; and severe memory loss."  AR
300.  Levine has extensive experience treating patients for CFS.
On August 21, 1995, Dr. Levine wrote a letter stating that
plaintiff's CFS commenced in 1990.  She recounted plaintiff's
medical history – including plaintiff's reported stiff neck
starting in early 1991 and her exhaustion, sore throat and nasal
congestion starting shortly thereafter.  She concluded that
plaintiff's "presenting diagnosis was the chronic fatigue
syndrome and that depression occurred as a secondary factor.  Her
illness is primarily not a mental illness but a physical one."
AR 300.

### *Hammer IME and January 1996 Appeal Denial*

On September 5, 1995, plaintiff's husband submitted an
administrative appeal of Prudential's denial of June 28, 1994,
claiming that plaintiff suffered from CFS and attaching Levine
Report I.  After receiving plaintiff's medical records,
Prudential referred her appeal to Dr. Glenn Hammer, an infectious
disease specialist, for an IME.

Dr. Hammer reviewed the medical records supplied, including
those from Dr. Levine, the Rockland County Department of Mental
Health and Dr. D'Anton, along with several statements from
plaintiff's husband.  He did not specifically mention reviewing

10

the Lawrence Report.  In a letter dated December 26, 1995, Dr.
Hammer disagreed with Dr. Levine, opining that plaintiff's
"significant psychiatric problems" could explain her entire
symptomology; therefore plaintiff did not meet the criteria for
CFS, which is a "diagnosis of exclusion."  AR 268.  He noted that
plaintiff's physical examinations were normal, save a red throat
and enlarged cervical lymph nodes.  Id.

After reviewing plaintiff's record, including the Levine and
Hammer reports, Prudential denied her appeal on January 9, 1996.
Prudential concluded that plaintiff's disability was psychiatric.

### Levine Report II

On January 18, 1996, Dr. Levine responded to Dr. Hammer's
report, disagreeing with his conclusions.  Levine noted that the
revised definition of CFS, published in the Annals of Internal
Medicine in December 1994, allowed for CFS patients to have a
pre-existing psychiatric disorder.  She also noted that a CFS
patient need not have physical abnormalities other than red
throat and enlarged cervical lymph nodes.  She further stated
that other disorders, including thyroid problems, autoimmune
disorders, and Lyme disease had been excluded.  AR 265.

### Krupp IME and August 1996 Appeal Denial

On February 8, 1996, plaintiff filed another administrative
appeal.  In June, Prudential referred the matter to Dr. Lauren
Krupp, a neurologist and fatigue expert, for an IME opinion.  Dr.

Krupp reviewed plaintiff's records – while she lists all the records she reviewed, she does not mention the Lawrence Report – and noted that all the reports were by mental health professionals except those from Drs. Levine and Hammer.

In her July 19, 1996 IME, Krupp recounted plaintiff's history and concluded that while the Levine Report II correctly noted the inclusion and exclusion criteria for CFS, "certain issues regarding [plaintiff] cast major doubt on the appropriateness of the chronic fatigue syndrome diagnosis."  AR 253.  Krupp found that during the period from 1991 to 1994, plaintiff's symptoms of sleep disturbance – potentially indicative of CFS – "were secondary to the overwhelming psychiatric disturbance noted by the treating healthcare personnel."  Id.  She found that Dr. D'Anton's exam provided a "compelling" reason to doubt plaintiff's recollections of her symptoms, offered retrospectively during her assessments by Dr. Levine.  "Finally," Dr. Krupp opined, "the medical records simply do not substantiate the onset of a primary fatigue related disorder during the period between 1991-4."  AR 254.

On August 5, 1996, based on all records submitted up to that point, including the Levine Report II and the Krupp IME, Prudential again denied the appeal.  Although plaintiff requested a final appeal on August 30, 1996, her attorney did not send any new evidence, and Prudential closed plaintiff's claim file on

November 17, 1997.  While plaintiff continued to receive treatment, she did not take any further action on her claim until 2004.

### Pellegrino Report

Dr. Levine referred plaintiff to Dr. Mark Pellegrino for a physiatric consultation.  She was examined on January 7, 1997. After talking with plaintiff and finding that she had reproducible painful tender points, Dr. Pellegrino concluded that she had both chronic fatigue syndrome and fibromyalgia, a syndrome characterized by widespread pain.  1074-76.

### Levine Report III

In a March 27, 1998 letter, Dr. Levine reiterated that plaintiff had been under her care for CFS for three years and that plaintiff also suffered from fibromyalgia.  She confirmed her impression that plaintiff began experiencing symptoms in 1990 and was totally disabled by the Spring of 1991.  Dr. Levine detailed the extent of plaintiff's exhaustion, noting that even on her better days, plaintiff could not walk more than one and a half blocks without a cane and could not climb more than three stairs at a time.  According to Dr. Levine, an examination on March 18, 1998 revealed prior exposure to Human Herpes Virus 6, "an agent thought to be causative of CFS."  AR 1464-65.

### 2004 Revival of Claim

In October 2004, plaintiff's counsel requested a final

13

administrative appeal of plaintiff's claim.  He submitted several
new reports in the final appeal.

### *Bell Report*

On September 23, 2002, Dr. David S. Bell wrote a report
summarizing his examination of the plaintiff.  He noted that a
hematologist had diagnosed plaintiff with polycythemia vera, a
blood disorder.  He stated that upon examination, plaintiff
showed no signs of depression, answered questions in a
straightforward manner and did not exaggerate her symptoms.
Based on his examination, he diagnosed plaintiff with
polycythemia vera, chronic fatigue syndrome/fibromyalgia and
obesity.  AR 1061-62.  He opined that the polycythemia vera was
most concerning: plaintiff's records showed that she had
decreased circulating blood in October 2000 and then extremely
high circulating blood volume in 2002.

Bell wrote that plaintiff's diagnosis of CFS and
fibromyalgia beginning in 1991 "is fairly well established."  AR
1062.  He opined that plaintiff did not, as of his examination,
have a psychiatric diagnosis that would explain her symptoms, and
her previous diagnosis of post-traumatic stress disorder was
likely a function of her "doing badly because of her chronic
fatigue syndrome and the additional stresses at that time caused
an increased hardship."  AR 1063.

14

***VanNess Report***

Dr. Mark VanNess performed cardiopulmonary exercise evaluations in January 2005 and found that while plaintiff made a good effort, she was extremely slow to recover after the tests. He noted that her decline in performance between the first and second tests was consistent with impaired oxidative metabolism. He concluded that plaintiff had diminished aerobic capacity, diminished cardiovascular responses, and significant post-exertional impairment.  Dr. VanNess stated that plaintiff's results were consistent with published reports of functional capacity in CFS patients.  AR 1102.

***Nwokike Report***

At the request of plaintiff's counsel, Yale University's Dr. Jerome Nwokike issued a psychiatric report on April 27, 2005. Dr. Nwokike interviewed plaintiff, her husband and her cousin, and he reviewed plaintiff's extensive medical record.  A psychological evaluation by Douglas Rau, Ph.D., was consistent with plaintiff's stated difficulties in concentration, attention, psychomotor slowing, and word finding.  AR 1240.  Plaintiff exhibited cognitive deficits including poor attention, concentration, memory registration and recall.  Nwokike observed that plaintiff exaggerated her symptoms of pain, and Dr. Rau opined she had a mixed personality disorder with narcissistic and histrionic features, but psychological screens for malingering

15

indicated that she was not intentionally feigning cognitive deficits or memory impairments.  AR 1243, 1246.  While plaintiff did not endorse symptoms suggestive of psychological disorders including depressive disorder and PTSD, the report noted that she minimized psychiatric vulnerabilities and symptoms, so it was difficult to evaluate the status of prior psychiatric diagnoses.  AR 1246.

Dr. Nwokike recounted plaintiff's early psychiatric diagnoses and opined that they did not explain some of her documented symptoms, including the headaches and poor memory that she reported in 1991 and 1992.  He noted that she was diagnosed with CFS in 1993.[8]  Nwokike suggested that her concurrent psychological and physical diagnoses could be explained by co-morbidity: co-occurrence of two or more conditions.  AR 1245.

### Lerner Report

On September 15, 2005, after meeting with plaintiff and reviewing her records, Hank Lerner concluded in an employability assessment that Tritt did not have the cognitive ability to perform her past highly skilled activities.  He opined that "she is disabled from all commensurate occupations.  This is due to

_____

[8] Dr. Nwokike states that plaintiff was diagnosed with CFS by Dr. Grant Mitchell in August 1993.  The letter from Dr. Mitchell on record is from 1998; while Dr. Mitchell notes that he began treating plaintiff in August 1993, and while he opines that plaintiff began suffering from CFS in 1989, he does not say that he diagnosed plaintiff with CFS on her first visit.  See AR 1424.

her ongoing severe fatigue, which results in her inability to maintain consistent attendance, and task performance." AR 1190.

### *Marion IME*

ADP referred plaintiff's claim to Dr. Phillip Marion, a specialist in physical medicine and rehabilitation, for an IME. Dr. Marion reviewed plaintiff's file – he does not list the Lawrence Report in his catalogue of materials reviewed – and he issued his report on January 3, 2006.  ADP asked if claimant's primary diagnosis was "medical or mental/nervous?"  Dr. Marion concluded that it was mental/nervous and included anxiety, depression, PTSD, personality disorder, dysthymia, histrionic personality disorder and panic attacks.  He emphasized that plaintiff was able to actively participate in group therapy sessions with Ms. Ryglewicz from 1992 through 1995.  Dr. Marion concluded from plaintiff's records that her primary diagnosis became medical, or physical, in 1995.  AR. 2248-61.

### *January 2006 Final Claim Denial*

ADP sent plaintiff a final claim appeal determination on January 26, 2006.  AR 2242.  ADP denied plaintiff's appeal, citing the lack of a contemporaneous diagnosis of a physical diagnosis and citing the Hammer, Krupp and Marion IMEs, all of which found that plaintiff was not totally physically disabled by September 13, 1993.  AR 2243-2246.  The denial informed plaintiff that she had exhausted her administrative remedies and advised

her of her right to bring a civil lawsuit under Section 502(a) of
ERISA to challenge the adverse determination.  AR 2247.  On
December 29, 2006, plaintiff exercised that right.[9]

II.  Discussion

     Standard of Review

     The parties have cross-moved for judgment on the
administrative record on plaintiff's claim for wrongful denial of
benefits.  When a party moves for judgment on the administrative
record in an ERISA case, the parties may consent to a bench trial
on the papers.  See O'Hara v. National Union Fire Ins. Co. of
Pittsburgh, PA, 642 F.3d 110, 116 (2d Cir. 2011).  At oral
argument, the parties agreed that I should render a decision on
the merits based on the appeal record.

     "[A] denial of benefits challenged under § 1132(a)(1)(B) is
to be reviewed under a *de novo* standard unless the benefit plan
gives the administrator or fiduciary discretionary authority to
determine eligibility for benefits or to construe the terms of
the plan."  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101,
115 (1989).  The 1986 Plan does not give the administrator

_____

     [9] Plaintiff asks me to consider material from Dr. Levine
written after ADP's January 26, 2006 determination as well as
medical records that were not part of the plan administrator's
final review.  Judge Droney previously ruled that no good cause
exists to supplement the administrative record.  Doc. 155.  This
suit is a review of the January 26, 2006 denial, and the review
is limited to what was in front of the plan administrator.
Therefore, I do not consider evidence submitted after the final
appeal.

discretion, and as that Plan governs this action, the Court review's the administrator's decision *de novo*.

On *de novo* review, "a district court may render a determination on a claim without deferring to an administrator's evaluation of the evidence," and "is free to evaluate a treating physician's opinion in the context of any factors it considers relevant, such as the length and nature of their relationship, the level of the doctor's expertise, and the compatibility of the opinion with the other evidence." Lochner v. Unum Life Ins. Co. Of Am., 389 F.3d 288, 296-7 (2d Cir. 2004).

While the administrator's decision is reviewed *de novo*, a "plaintiff challenging the denial of benefits under an ERISA plan bears the burden of proving, by a preponderance of the evidence, that she is 'totally disabled' within the meaning of the Plan. This is in keeping with the general tenet of insurance law that 'the insured has the burden of proving that a benefit is covered.'" Fitzpatrick v. Bayer Corp., No. 04 Civ. 5134(RJS), 2008 WL 169318, at *9 (S.D.N.Y. Jan. 17, 2008) (citing and quoting Paese v. Hartford Life Accident Ins. Co., 449 F.3d 435, 441 (2d Cir. 2006)) (internal citation omitted). Plaintiff, then, bears the burden of proof in this action.

The parties agree that the central question in this case is whether ADP properly decided to terminate plaintiff's benefits effective as of September 13, 1993. In other words, does the

19

appeal record that was before the administrator show that
plaintiff was totally physically disabled on September 13, 1993,
as she claims, or did ADP properly determine that plaintiff was
totally disabled by a mental or emotional illness?  After careful
review of the record, I conclude that plaintiff has failed to
meet her burden, as the record does not show by a preponderance
of the evidence that plaintiff had a totally disabling physical
disorder as of September 13, 1993.

    Propriety of Denial

    Plaintiff argues that defendants improperly denied her
continuing benefits, as she was diagnosed with CFS by Dr.
Lawrence before September 13, 1993, and this early diagnosis is
supported by Dr. Susan Levine's retrospective analysis of
plaintiff's condition.  She contends that she had a co-morbid
condition – consisting of both CFS and psychiatric disorders –
that totally disabled her.  Defendants respond that there is no
objective evidence – only plaintiff's own subjective statements –
of physical illness before September 13, 1993, and Dr. Levine's
diagnosis of CFS beginning in 1990 is retrospective and therefore
not entitled to weight.  They maintain that Dr. Lawrence could
not have diagnosed plaintiff with CFS.  Defendants also argue
that a totally disabling co-morbid condition does not justify an
award of benefits beyond 24 months, as it is a "disability caused
by or resulting from . . . mental or emotional illness" under the

Plan.[10]  While I agree with plaintiff that she suffered from CFS
before September 13, 1993, I agree with defendants that this
diagnosis is insufficient to sustain her burden.  Plaintiff has
not shown that her CFS was totally disabling, under the Plan, as
of September 13, 1993.  Therefore, defendants' determination was
proper.

### *Dr. Lawrence's Diagnosis*

I agree with plaintiff that Dr. Lawrence diagnosed her with
CFS as of June 25, 1993.  The Lawrence Report includes CFS in the
section for "treating diagnoses."  Defendants contend that the
question mark in front of the name of the disorder indicates
uncertainty about the diagnosis.  Plaintiff responds that the
question mark indicates uncertainty about the classification
code, not the diagnosis.  I agree with plaintiff's
interpretation.  The question mark appears before the entry of
the name of the disorder and is aligned with the ICD-9 (disease
classification) codes for other treating diagnoses.  CFS was not
assigned an ICD-9 code until 1998.  If Dr. Lawrence were
expressing uncertainty about the diagnosis, he likely would have
put the question mark after the name of the disorder.  Further,

---

[10] While plaintiff's complaint alleges procedural violations
– that defendants failed to give plaintiff's claim a full and
fair review – her papers acknowledge that "[t]he issue at hand is
the cause of [plaintiff]'s continuing disability and whether the
Plan covers that cause."  Her motion for judgment does not
discuss procedure.  Therefore, the only issue I address is
whether the evidence supports the administrator's finding.

the Social Security Administration interpreted the report as
diagnosing CFS.  <u>See</u> AR 1404.

Defendants argue that Dr. Lawrence could not diagnose CFS
because he is a psychiatrist and "not a medical doctor."
Plaintiff correctly responds that psychiatrists are medical
doctors and Dr. Lawrence lists his title as "MD" at the end of
his report.  AR 678.  I see no reason why a psychiatrist would
not be able to diagnose a physical disorder.  Indeed, several of
the symptoms Dr. Lawrence listed – insomnia, exhaustion, memory
problems, pain and weakness in limbs, occasional migraine
headaches and poor concentration – are indicative of CFS.  It
seems, then, that Dr. Lawrence diagnosed plaintiff based on
appropriate criteria.  The administrator's finding that plaintiff
was not diagnosed with CFS during the eligibility period was
improper.

### *Objective Evidence*

Defendants argue that because plaintiff cannot produce
objective evidence that she had CFS before September 13, 1993,
she is not entitled to benefits.  While I agree with defendants
that plaintiff's self-diagnosis cannot by itself sustain her
claim for benefits, I conclude that if trained medical
professionals find subjective evidence relevant in diagnosing
CFS, the subjective evidence can support plaintiff's claim.

In April 1993, plaintiff told Ms. Ryglewicz that she had

22

read about "Chronic Fatigue Immune Dysfunction Syndrome" and
believed she had the disorder.  While plaintiff's comments
provide some evidence that she was fatigued in April 1993, this
self-diagnosis, which is not only subjective but also non-expert,
does not fulfill the "written proof" requirement of the Plan.
Cf. Mallwitz v. Penn Ventilator Co., Inc., No. Civ. 02-3762
(DWF/SRN), 2004 WL 114944, at *7 (D. Minn. Jan. 20, 2004) ("UNUM
cannot reasonably be expected to rely upon Mallwitz's
self-diagnosis during the gap in treatment.")

However, while the Plan requires "written proof" of total
disability, and the "very concept of proof connotes objectivity,"
Maniatty v. Unumprovident Corp., 218 F. Supp. 2d 500, 503
(S.D.N.Y. 2002), aff'd 62 Fed. Appx. 413 (2d Cir. 2003), a number
of the diagnostic criteria for CFS, including fatigue and
headaches, are subjective or necessarily self-reported.  Cf.
Connors v. Conn. Gen. Life Ins. Co., 272 F.3d 127, 136 (2d Cir.
2001) ("It has long been the law of this Circuit that the
subjective element of pain is an important factor to be
considered in determining disability.") (internal quotation marks
omitted).  As Dr. Levine noted, "there need not be any signs at
all or abnormalities on physical exam to include the patient
under the diagnosis of CFS."  AR 265.  A valid CFS diagnosis may
therefore rely on contemporaneous subjective complaints.

There is some danger that plaintiff's complaints were

designed to manufacture a physical disability that would allow
her to collect benefits under the Plan.  The Second Circuit has
said that "it is not unreasonable for ERISA plan administrators
to accord weight to objective evidence that a claimant's medical
ailments are debilitating in order to guard against fraudulent or
unsupported claims of disability."  Hobson v. Met. Life Ins. Co.,
574 F.3d 75, 88 (2d Cir. 2009).  While a number of plaintiff's
doctors over time concluded that she was histrionic or
exaggerating her symptoms – see, for example, the reports of Drs.
D'Anton, Neffinger, and Nwokike – when she was tested for
malingering in 2005, the results indicated she was not feigning
her symptoms.  AR 1253-54.  Therefore, while I view plaintiff's
subjective complaints with skepticism, I think they should be
accorded some weight.

    Reviewing plaintiff's claim *de novo*, then, I credit Dr.
Lawrence's report, which relied on plaintiff's contemporaneous
complaints of symptoms supporting a CFS diagnosis.  The
subjective nature of these symptoms does not preclude the
diagnosis.

### Retrospective Diagnoses

    Defendants argue that retrospective diagnoses, including
those made by Dr. Levine after plaintiff began seeing her for
treatment, should be disregarded.  They argue that the Krupp and
Marion IMEs correctly discount symptoms reported retrospectively

24

and any diagnoses based on those retrospective reports.  I do not agree that retrospective diagnoses are necessarily invalid or entitled to less weight than contemporaneous diagnoses, but the record here provides cause to question Dr. Levine's retrospective diagnoses.

Plaintiff correctly notes that the Second Circuit has repeatedly given weight to proper retrospective diagnoses in Social Security cases.  "A diagnosis of a claimant's condition may properly be made even several years after the actual onset of the impairment.  Such a diagnosis must be evaluated in terms of whether it is predicated upon a medically accepted clinical diagnostic technique and whether considered in light of the entire record, it establishes the existence of a physical impairment prior to [the end of eligibility]."  Dousewicz v. Harris, 646 F.2d 771, 774 (2d Cir. 1981) (quoting Stark v. Weinberger, 497 F.2d 1092, 1097 (7th Cir. 1974)).  The "treating physician rule" does not apply to claims under ERISA; but it is still relevant that in a Social Security case, "a retrospective medical diagnosis by a treating physician is entitled to controlling weight when no medical opinion in evidence contradicts a doctor's retrospective diagnosis finding a disability."  Roy v. Apfel, 201 F.3d 432, at *4 (2d Cir. 1999) (quotations omitted) (citing Rivera v. Sullivan, 923 F.2d 964 (2d Cir. 1991) & Wagner v. Secretary of Health & Human Servs., 906

25

F.2d 856 (2d Cir. 1990)).  Were retrospective diagnoses categorically invalid, this application of the treating physician rule would be nonsensical.  Therefore, while an administrator should credit Dr. Levine's retrospective diagnosis only to the extent it is predicated on a medically accepted technique, and while the administrator should consider contradictory evidence in the record in evaluating the accuracy of the retrospective diagnosis, a diagnosis is not invalid simply because it is retrospective.

Dr. Levine's contemporaneous diagnosis is credible.  She is an expert in the field, and plaintiff's subjective complaints were corroborated by her red throat and enlarged cervical lymph nodes at that time.  Later evaluations by Drs. Bell, VanNess, and Nwokike confirmed objective physical deficiencies related to CFS. The record, then, establishes that plaintiff did have CFS from at least 1995.

Dr. Levine's retrospective diagnosis, however, is not fully supported by the record.  She concludes that plaintiff's illness began in 1990 or early 1991.  However, while there is some contemporaneous evidence of plaintiff's stiff neck at that time, plaintiff worked long hours for the first half of 1991, and her medical complaints that year largely concerned depression and PTSD, not unrelenting exhaustion.  The Rothman Report indicates that as of May 1992, her cognitive function was still strong.

26

Given plaintiff's history of histrionics, it seems probable that she exaggerated her symptoms in retrospect.  Further, I cannot ignore that by late June 1994, Prudential had informed plaintiff that she was not eligible for continuing benefits because she did not have a physical condition causing total disability as of September 12, 1993.  AR 304-305.  As Dr. Krupp noted in her IME, plaintiff stood to gain from recalling past physical disability.

Therefore, while plaintiff's CFS diagnosis in 1995 increases the likelihood that she had CFS in 1993, I conclude that Dr. Levine's diagnosis based on plaintiff's recollections of her symptoms should be accorded little weight.  The record does not show by a preponderance of the evidence that plaintiff suffered from CFS in 1991, as Dr. Levine suggested.  However, Dr. Lawrence's contemporaneous diagnosis, along with plaintiff's well-established diagnosis after the eligibility period, is sufficient to show that plaintiff did suffer from CFS by September 12, 1993.

### Co-Morbidity

By a clear preponderance, the record shows that plaintiff suffered from disabling mental illness during the eligibility period.  While Dr. D'Anton did not find plaintiff credible, Dr. Tedrow, Dr. Neffinger and Dr. Lawrence, among others, diagnosed her with depression, anxiety, and post-traumatic stress disorder. Plaintiff's initial claims for disability benefits relied on

27

these diagnoses: she told Prudential she was totally disabled by mental illness, and Prudential awarded her benefits on that basis.

Plaintiff now asserts that she had a co-morbid condition – she was both mentally and physically sick during the eligibility period.  I agree.  However, plaintiff also asserts that because she was totally disabled, and her disability had a physical component, she is entitled to continued benefits.  I agree with defendants that this misstates the terms of the Plan.

The Plan limits benefits for any disability "caused by or resulting from" mental or emotional illness.  In other words, if a claimant's mental or emotional illness is a but for cause of her total disability – if her physical illness, by itself, is not totally disabling – then her benefits are capped at 24 months. Because the record does not establish by a preponderance of the evidence that as of September 12, 1993, plaintiff's CFS was totally disabling, she does not meet the Plan's requirement for continuing benefits.

Dr. Tedrow concluded that plaintiff was totally disabled by her mental illness.  Dr. Neffinger concluded plaintiff could not function "in reaction to the break-up of her marriage and loss of her job."  Ms. Ryglewicz noted symptoms of major depression and PTSD throughout 1992 and 1993, and in May 1994, after the eligibility period terminated, opined plaintiff's "depression and

28

anxiety symptoms have been only partially relieved by medication."  The record establishes, then, that plaintiff's psychological disorders were, themselves, totally disabling, and they continued throughout the eligibility period.  In 1993, Dr. Lawrence diagnosed plaintiff with a co-morbid condition consisting of chronic depression, dysthymia, PTSD and CFS.  He also found that plaintiff would be unable to work due to "skill impairments, mood disorder, anxiety and loss of self confidence & stress reactivity . . . ."  He does not specify whether plaintiff's chronic fatigue syndrome would itself be totally disabling.

While Dr. Levine characterized CFS as a "debilitating disorder," her own retrospective diagnosis indicates that CFS does not always totally disable.  Dr. Levine concluded that plaintiff had CFS in the first half of 1991, when she continued to work long days.  If this diagnosis was plausible to Dr. Levine, she must have believed that a person with CFS may still function.  Therefore, Dr. Lawrence's CFS diagnosis does not establish that plaintiff's physical disorder would be totally disabling even without her psychological disorders.

Some retrospective evidence indicates that what appeared at the time to be mental illness was actually CFS.  For example, as Dr. Bell interprets the record, plaintiff "was doing badly because of her chronic fatigue syndrome and the additional

stresses at that time caused an increased hardship." AR 1063.
However, plaintiff's doctors from 1991-1993 note depressive
symptoms more than fatigue.

The weight of the evidence shows that plaintiff was, indeed,
depressed during the eligibility period.  Now the burden falls on
her to show that these psychiatric diagnoses – the diagnoses she
used to claim two years of benefits in 1994 – were not in fact
the cause of her total disability.  While there is no question
that plaintiff was totally disabled in September 1993, and while
plaintiff was later totally disabled by CFS, plaintiff has failed
to sustain her burden of showing that had she not been depressed
and suffering from PTSD in September 1993, she still would have
been totally disabled at that time.  Because plaintiff has not
sustained this burden, I conclude that the administrator properly
denied plaintiff's claim for benefits after September 12, 1993.
Accordingly, defendants' motion for judgment on the
administrative record is granted and plaintiff's motion is
denied.

III. <u>Motion for Sanctions</u>

Plaintiff's counsel moves for sanctions pursuant to Fed. R.
Civ. P. 11 (doc. 169) arguing that defendants' counsel made
untrue and unsupported statements in its response brief (doc.
165).  Rule 11(b)(3) provides: "By presenting to the court a
pleading, written motion, or other paper ... an attorney ...

30

certifies that to the best of [his] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the factual contentions have evidentiary support . . . ." Rule 11(b)(4) requires denials of factual contentions to be warranted by the evidence.

If a court finds that Rule 11 has been violated it "may impose an appropriate sanction. . . ." Fed. R. Civ. P. 11©. Liability for Rule 11 violations requires a showing of "objective unreasonableness" on the part of he attorney. See ATSI Communications, Inc. v. Shaar Fund, Ltd., 579 F.3d 143, 150 (2d Cir. 2009) (quoting Ted Lapidus, S.A. v. Vann, 112 F.3d 91, 96 (2d Cir. 1997)).  I conclude that defendants' conduct does not warrant sanctions.

While plaintiff's counsel alleges ten unsupported statements in defendants' response brief, these statements reduce to four alleged falsities:

1.   Dr. Lawrence never diagnosed plaintiff with CFS.

2.   Dr. Lawrence could not diagnose her because he was not a medical doctor.

3.   Dr. Marion considered Dr. Lawrence's opinion during his IME.

4.   The documents in AR 2093-2121 – those produced after the final claim denial – have never been considered to be within the Administrative Record.

I conclude that sanctions are unwarranted for the following

reasons.  First, whether Dr. Lawrence diagnosed plaintiff with CFS in his 1993 report was a legitimate dispute of fact in this case.  While I have found plaintiff's interpretation of this diagnosis to be correct, it was not objectively unreasonable for defendants to argue that the question mark indicated uncertainty about the diagnosis.  Counsel's advocacy on this point is not sanctionable.

Second, while defendants' counsel erred in stating that Dr. Lawrence was "not a medical doctor," this error is not sufficiently significant either in terms of its nature or effect as to justify imposing a sanction.

Third, while Dr. Marion does not list the Lawrence Report in his catalogue of documents reviewed, defendants' counsel avers that Dr. Marion received the entire administrative record.  I credit counsel's representation that ADP sent Dr. Marion the full record.  It was not objectively unreasonable for counsel to state that Dr. Marion had reviewed the record in full.

Finally, plaintiff's counsel argues that the complaint referenced documents produced after January 26, 2006, and defendants' answer admitted their relevance.  Therefore, plaintiff's counsel argues, defendants cannot claim that they were never part of the administrative record.  Defendants' answer simply admitted that these documents existed and spoke for themselves.  The administrative record, even under *de novo*

32

review, is limited to what was before the plan administrator at plaintiff's final appeal.  See Doc. 155.  Counsel's statement that documents produced after January 26, 2006 were never in the administrative record was accurate.

IV.  Conclusions

For the foregoing reasons, defendants' motion for judgment on the administrative record (doc. 159) is granted, and plaintiff's cross-motion (doc. 160) is denied.  Plaintiff's motion for sanctions (doc. 169) is also denied.  The Clerk will enter judgment for the defendants.

So ordered this 11th day of August 2012.


                              /s/ RNC
                    _____
                         Robert N. Chatigny
                    United States District Judge


33